UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TARA S. HOPPER,

      Plaintiff,

  v.

CREDIT ASSOCIATES, LLC, *et. al.,*

      Defendants.

Case No. 2:20-cv-522
**JUDGE EDMUND A. SARGUS, JR.**
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

Defendant Trans Union LLC ("Trans Union") moves to dismiss Counts Four and Five of Plaintiff Tara S. Hopper's ("Hopper") Second Amended Complaint for failure to state a claim upon which relief can be granted. (Mot. to Dismiss, ECF No. 39.) For the reasons stated below, Trans Union's Motion to Dismiss (ECF No. 39.) is **DENIED**.

### I.

**Statement of Facts**

In late January of 2019, Tara Hopper received a letter in the mail. (Second Am. Compl. at ¶ 29, ECF No. 33.) "PRE-APPROVED" read the letter. (*Id.* at PageID# 198.) "Records indicate you may have excessive credit card debt. Due to an important ruling to protect consumers in credit card debt, you are pre-approved for a debt relief program that can save you thousands of dollars with no upfront cost to you." (*Id.*) The letter listed Hopper's estimated credit card debt, a projected settlement amount, and the estimated program payment. (*Id.*) All she had to do was respond by February 25, 2019, to take advantage of her pre-approved status. (*Id.*)

The letter informed Hopper: "Your pre-approval provides a no-risk guarantee." (*Id.*) It elaborated, "pre-approval guarantees the *extra* deferral of fees that would have otherwise been due

after each account is successfully resolved." (*Id.* (emphasis added).) Further down, there was a notice. (*Id.*) The notice informed Hopper that "[t]his 'pre-screened' offer of credit" was based on information in her credit report. (*Id.*)

The letter was from Credit Associates, LLC ("Credit Associates"). (*Id.*) It included a reference number, as well as a toll-free number that Hopper could call to speak with a "Certified Debt Consultant." (*Id.*) Around January 23, 2019, Hopper called the number. (*Id.* at ¶ 40.) She spoke with "Jimmy," a Credit Associates representative. (*Id.* at ¶ 41.) Jimmy explained the debt settlement program, but never mentioned any deferral of fees, or an extra deferral. (*Id.* at ¶¶ 41, 43.)

It was still late January when Hopper received a second letter from Credit Associates, this one dated January 25, 2019. (*Id.* at ¶ 30.) The letter informer her that this was her "FINAL NOTICE." (*Id.* at PageID# 200.) "Due to ongoing balance changes," it explained, "we may never contact you again so to ensure inclusion in our program, contact us immediately as your activation terms are eligible until March 11, 2019." (*Id.*) The deadline had apparently been extended, and though this letter was similar to the first letter in most other respects, it did include a few more changes. (*Id.*) Hopper was given a new number to call, and her reference number had been changed. (*Compare id.* at PageID# 198 *with id.* at PageID# 200.) This second letter also clarified that the estimated program payment of $140 was a monthly payment. (*Id.* at PageID# 200.) Once again, the letter informed her that "[y]our pre-approval guarantees the extra deferral of fees that would have otherwise been due after each account is successfuly [sic] resolved." (*Id.*)

Hopper called the number. (*Id.* at ¶ 40.) This time Hopper spoke with a Credit Associates representative named Russell Towers. (*Id.* at ¶ 42.) Towers elaborated upon the debt settlement program and indicated that a law firm would handle Hopper's debt settlement. (*Id.* at ¶ 42.) As had

occurred with Jimmy, Towers also never offered Hopper any sort of fee deferral. (*Id.* at ¶¶ 43, 45.) Credit Associates failed to offer any such deferral in its sales pitch, and also allegedly, in practice "Credit Associates does not defer extra fees for Ohio consumers," and the third-party law firm's fees "are payable in full when earned pursuant to the contract." (*Id.* at ¶ 56.)

Hopper had been targeted by Credit Associates' direct-mail marketing campaign based on her inclusion in a pre-screened list compiled and provided by Trans Union. (*See id.* at ¶¶ 14, 22, 29.) She never herself authorized Credit Associates to obtain her credit report. (*Id.* at ¶ 44.)

**Procedural Background**

On January 30, 2020, Hopper filed suit against Credit Associates and Trans Union, alleging violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"). (ECF No. 1.) In Counts Four and Five (Courts Three and Four of the original Complaint), Hopper claims Trans Union violated FCRA through willful noncompliance (Count Four), and negligent noncompliance (Count Five). (Second Am. Compl. at PageID# 192, 193, ECF No. 33.)

Trans Union did not file an answer, but instead moved to dismiss for failure to state a claim. (ECF No. 6.) Hopper amended her Complaint to include additional factual support, and to include an additional cause of action against Credit Associates. (ECF No. 17.) Trans Union then moved to dismiss Counts Four and Five of the Amended Complaint for failure to state a claim. (ECF No. 26.) Hopper moved to file a Second Amended Complaint (ECF No. 31), which was granted (ECF No. 32.), and Hopper filed her Second Amended Complaint. (ECF No. 33.)

Trans Union moved to dismiss Counts Four and Five of the Second Amended Complaint for failure to state a claim. (Mot. to Dismiss, ECF No. 39.) Hopper responded in opposition (ECF No. 43.), and Trans Union replied. (ECF No. 50.) The motion, (ECF No. 39), is now fully briefed and ripe for review.

## II.

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 "does not require 'detailed factual allegations,'" but pleadings cannot consist only of "labels and conclusions," "formulaic recitation[s] of the elements of a cause of action," or "'naked assertion[s] devoid of "further factual enhancement."'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). To survive a motion to dismiss for failure to state a claim for which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), "a plaintiff must 'allege[ ] facts that "state a claim to relief that is plausible on its face" and that, if accepted as true, are sufficient to "raise a right to relief above the speculative level."'" *Mills v. Barnard*, 869 F.3d 473, 479 (6th Cir. 2017) (citation omitted). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. When reviewing a complaint subject to a Rule 12(b)(6) motion, the "exhibits attached to the complaint" may also be considered. *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001). Courts must "construe the complaint in the light most favorable to the plaintiff and accept all [factual] allegations as true." *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 252 (6th Cir. 2020) (alteration in original) (quoting *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012)).

### III.

The Fair Credit Reporting Act includes a statement of findings and purpose, which is useful for contextualizing this matter. Congress found, *inter alia*, that "[t]here is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4). Thus, the statute's stated purpose is to require consumer reporting agencies to adopt "reasonable procedures" to meet "the needs of commerce" for consumer credit information while giving due regard to the consumers' interest in "confidentiality" and the "proper utilization" of the information. 15 U.S.C. § 1681(b).

Under FCRA a consumer reporting agency such as Trans Union may furnish consumer reports for specifically enumerated purposes only. 15 U.S.C. § 1681b(a). Trans Union must "maintain reasonable procedures designed . . . to limit the furnishing of consumer reports to the purposes listed" in Section 1681b. 15 U.S.C. § 1681e(a). This provision obligates Trans Union to require recipients of consumer reports—here, Credit Associates—to identify themselves, certify their intended use for the requested consumer reports, and "certify that the information will be used for no other purpose." *Id.* Trans Union must then "make a reasonable effort to verify this information," and is prohibited from furnishing the requested firm offer lists "if it has reasonable grounds for believing" that they will not be used for the certified purpose. *Id.*

Many of the permissible purposes for furnishing a consumer report do not raise significant privacy concerns because they are initiated by the consumer. *Cole v. U.S. Capital*, 389 F.3d 719, 725 (7th Cir. 2004) (citing 15 U.S.C. § 1681b(a)(3)(A)–(F)). However, in certain circumstances the consumer reporting agency may furnish a report to a third party without the consumer's authorization, implicating more significant privacy concerns. *See id.* One such circumstance occurs when a consumer reporting agency furnishes a consumer report, without the consumer's

5

authorization, in connection with a "firm offer of credit or insurance." 15 U.S.C. § 1681b(c)(1)(B)(i). "In allowing consumer agencies to release information for the purpose of a 'firm offer of credit,' Congress 'balance[d] any privacy concerns created by pre-screening with the benefit of a firm offer of credit or insurance for all consumers identified through the screening process.'" *Cole*, 389 F.3d at 725 (quoting S.Rep. No. 103–209, 13 (1993)) (alterations in original).

Through Counts Four and Five, Hopper alleges Trans Union negligently and willfully violated FCRA by providing Credit Associates with consumer reports without a proper purpose. (Second Am. Compl. at ¶¶ 88, 95, ECF No. 33.) Trans Union argues that Counts Four and Five should be dismissed because the deferral of fees in the mailers constituted a firm offer of credit, and because Hopper failed to allege that she attempted to accept the offer. (Mot. to Dismiss at 10, 12, ECF No. 39; Reply at 3, ECF No. 50.) Hopper disagrees, and argues that the mailers do not constitute a firm offer of credit as defined by FCRA. Hopper offers three alternative theories in support of this contention. (Response at 2, ECF No. 43.) First, on their face the mailers did not extend a firm offer of credit as defined by FCRA. (*Id.* at 2, 8.) Second, if the mailers were facially sufficient, they still did not contain a firm offer of credit because this was a "sham" offer. (*Id.* at 2, 10.) Third, Credit Associates never intended to honor their offer, so even if it was otherwise a firm offer of credit, it still does not meet the statutory definition. (*Id.* at 2, 14.) The Court will address each theory in turn.

As an initial manner, the term "firm offer of credit or insurance" is defined in FCRA as "any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the offer, except that the offer may be further conditioned" on three specific conditions listed in the statute. 15 U.S.C. § 1681a(*l* ). These three conditions are concisely restated

6

in *Cole*. "First, the creditor may apply additional pre-selected criteria bearing on the consumer's creditworthiness." *Cole*, 389 F.3d at 726 (citing § 1681a(*l* )(1)). "Second, the firm offer may be conditioned on verification 'that the consumer continues to meet the specific criteria used to select the consumer for the offer.'" *Id.* (citing § 1681a(*l* )(2)). "Finally, the offer may be conditioned on the consumer's furnishing any collateral that was both established before the selection of the consumer for the offer and disclosed to the consumer in the offer." *Id.* (citing § 1681a(*l* )(3)).

Hopper submits that the mailers did not include a "firm offer of credit" because Credit Associates included a condition precedent that does not fit into any of the three categories above. As background, Hopper explains that federal regulations already required the deferral of fees until the achievement of a successful resolution of an account. (Response at 3, ECF No. 43.)[1] This appears to be so. *See* 16 C.F.R. § 310.4(a)(5)(i)(A).[2] As such, while the required deferral comes into play immediately, the extra deferral that constitutes the proffered credit only comes into play after the account has been successfully resolved, and only if it is successfully resolved. This creates a condition precedent. The consumer would have to enroll in the program first, then stay in the program until a successful debt renegotiation was achieved—if ever—and only if all that occurred would Credit Associates be obliged to honor its offer of an extra deferral of fees. This condition

---

[1] Trans Union mistakes this as a new claim under the Telemarketing Sales Rule ("TSR"), but the Court does not so view it. (Reply at 10, ECF No. 50.) Hopper is not alleging the violation of the TSR. Hopper is observing that the deferral of fees until the successful resolution of an account is required under the TSR. This observation is meant to illuminate the distinction between the required deferral and the extra deferral being offered as credit.

[2] Trans Union views this regulation as irrelevant, (Reply at 10–11, ECF No. 50.), but it would appear to plausibly apply here. This regulation prohibits sellers and telemarketers of debt relief services from requesting or receiving fees until the seller or telemarketer has "renegotiated, settled, reduced, or otherwise altered" the debt. 16 C.F.R. § 310.4(a)(5)(i)(A). The regulation defines a telemarketer in relevant part as one who, in connection with telemarketing, "receives" telephone calls from a customer. 16 C.F.R. § 310.2(ff). In turn, telemarketing is defined in pertinent part as a campaign to induce the purchase of services by use of a telephone. 16 C.F.R. § 310.2(gg). The mailer instructed Hopper to call. (Second Am. Compl. at PageID# 198, ECF No. 33.) Notably, the definition of telemarketing excludes the "solicitation of sales through the mailing of a catalog", but only where the catalog "includes multiple pages of written material or illustrations" and meets other requirements. 16 C.F.R. § 310.2(gg). The mailers in question appear to be only one page long and thus do not fit into this exclusion. (Second Am. Compl. at PageID# 198, 200, ECF No. 33.) Therefore, it would appear at least plausible that this definition of telemarketing is meant to include telemarketing that uses a one-page mailer as a lure.

precedent is not one of the conditions that the statute permits a firm offer to include. *See* 15 U.S.C. § 1681a(*l* )(1)–(3). Accordingly, the mailers do not include a "firm offer of credit" as defined by the statute.

Even if this credit was not impermissibly based on an unenumerated condition, Hopper has pled sufficient facts accepted as true for this Court to conclude that the offer was plausibly a "sham." (Response at 2, ECF No. 43.) The Sixth Circuit has not opined on this issue, but a few sister circuits have—most notably the Seventh Circuit. Two cases from that circuit stand out above the rest: *Cole v. U.S. Capital*, 389 F.3d 719 (7th Cir. 2004), and *Murray v. New Cingular Wireless Services, Inc.,* 523 F.3d 719 (2008).

In *Cole*, the Seventh Circuit explained that when an offer is merely a "guise for solicitation" and not a "legitimate credit product", it is not a "firm offer of credit." *Cole*, 389 F.3d 728. There, the mailer guaranteed the consumer a line of credit of at least three hundred dollars towards the purchase of a vehicle. *Id.* at 722. The Seventh Circuit reasoned that "a definition of 'firm offer of credit' that does not incorporate the concept of value to the consumer upsets the balance Congress carefully struck between a consumer's interest in privacy and the benefit of a firm offer of credit for all those chosen through the pre-screen process." *Id.* at 726–27. Reversing the district court's grant of dismissal, the appellate court concluded that the offer was plausibly "a sham made to justify access to the consumer credit reports." *Id.* at 728.

In *Murray*, the Seventh Circuit clarified the scope of *Cole*. That court held that "*Cole*'s objective was to separate *bona fide* offers of credit from advertisements for products and services," and that "*Cole* is beside the point for pure offers of credit." *Murray*, 523 F.3d at 722 (quotation omitted). The court continued that when credit reports are used to make offers of credit "and nothing but," the question is simply whether the offer was firm, without regard to value. *Id.*

8

In the absence of Sixth Circuit precedent, the Court finds that this division between pure offers of credit and offers of credit used to guise solicitations is persuasive; only in the latter case should a court look beyond whether the offer is firm to inquire also into whether it is valueless.

The question is, does this case fall under *Murray*, as an offer of credit and nothing but, or does it fall under *Cole*, as an offer of credit wrapped within an advertisement for products or services. Trans Union submits it is a pure offer of credit (Reply at 5, ECF No. 50.), and Hopper submits that it is a guise for solicitation. (*See* Response at 12–13, ECF No. 43.) Credit Associates offered Hopper participation in a debt relief program (a service), as well as an extra deferral of fees (the credit). It is therefore not a pure offer of credit, but an offer of credit wrapped in an advertisement for a service.

Applying *Cole*, it is plausible that Credit Associates' offer of credit was a valueless "guise for solicitation . . . ." *Cole*, 389 F.3d 728. Hopper alleges that the fees subject to the extra deferral are only deferred until the account is resolved (*See* Second Am. Compl. at ¶¶ 45, 56, ECF No. 33.), which was already required under federal regulations. 16 C.F.R. § 310.4(a)(5)(i)(A). Credit Associates was thus offering nothing more than that which it was already required to offer. If that is the case then this offer was an illusion, Hopper was offered no credit, and the mailers lacked a "firm offer of credit" as required by FCRA.

Finally, Hopper offers a third theory similar to the second for why the mailers do not meet the statutory definition of a firm offer of credit: if these mailers did include a firm offer of credit, Credit Associates never intended to honor it. (Resp. at 14, ECF No. 43.) As mentioned, the statutory definition of a "firm offer of credit" is an offer of credit "that will be honored" if the consumer is found to meet the conditions of the offer. 15 U.S.C. § 1681a(*l* ). Hopper alleged that Credit Associates never does and never intended to honor the offer, and likewise knows that the

9

third party for which it markets requires "payment in full when earned" without granting any extra deferral. (Second Am. Compl. at ¶ 56, ECF No. 33.)

Trans Union argues that Hopper must allege that she attempted to accept the offer and that Credit Associates refused to honor it, or else Hopper's theory fails to be sufficiently pleaded. This argument, however, is based on the unsupported premise that the consumer must first attempt to accept the offer before it can be established that the offeror never intended to honor it. Such a presumption would require the consumer to attempt to accept even the most blatantly false offer simply to get past the starting line. While that is the case for a traditional breach of contract claim—and reasonably so consider the injury there is the breach of said contract—that is neither the injury nor the claim here. Here the alleged injury is the invasion of privacy that occurred when Trans Union furnished Credit Associates with Hopper's credit report without her consent and without a proper purpose. Hopper only needs to plead that Credit Associates never intended to honor the offer. Hopper does not need to plead that she attempted to accept it.

Even assuming an attempt to accept is a prerequisite, such an attempt is readily inferable from the pleadings. Hopper alleges that, using the number listed on the mailers, she called Credit Associates twice ahead of the response deadlines and spoke to representatives about the debt settlement program. (Second Am. Compl. at ¶¶ 40–42, ECF No. 33.) She alleges that even though the mailers stated that pre-approval guarantees the extra deferral of fees, "no such offer was made to Hopper when she responded to the solicitations." (*Id.* at ¶ 45.) The Court can reasonably infer that when Hopper called the number on the mailers, she was attempting to accept the offer, because people do not typically call the numbers on such mailers simply to reject the offers. If they intend to reject the offer, they just throw it out.

## IV.

For the reasons stated above, Trans Union's Motion to Dismiss (ECF No. 39.) is **DENIED**.

**IT IS SO ORDERED.**

**3/10/2021**　　　　　　　　　　　　　　　　**s/Edmund A. Sargus, Jr.**
**DATE**　　　　　　　　　　　　　　　　　　　**EDMUND A. SARGUS, JR.**
　　　　　　　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**