UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TARA S. HOPPER, on behalf of**
**herself and all others similarly situated,**

   **Plaintiff,**

               Case No. 2:20-cv-522
               JUDGE EDMUND A. SARGUS, JR.,
               Magistrate Judge Chelsey M. Vascura

 **v.**

**CREDIT ASSOCIATES, LLC,**
**and TRANS UNION,**

   **Defendants,**

## OPINION AND ORDER

This matter is before the Court on Defendant Credit Associates, LLC.'s Motion to Dismiss this putative class action suit filed against it.  (ECF Nos. 79, 80.[1])  Plaintiff Tara S. Hopper has filed a Memorandum in Opposition (ECF No. 83) and Defendant Credit Associates filed a Reply (ECF No. 85).  Defendant Credit Associates also filed a Notice of Supplemental Authority (ECF No. 88) to which Plaintiff responded (ECF No. 89).  For the reasons that follow, the Court **DENIES** Credit Associates' Motion to Dismiss.

**I.**

Plaintiff Tara Hopper alleges that Credit Associates and Trans Union violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*. because they "illegally provided, obtained and/or misused consumer reports to market debt settlement services through direct-mail solicitations aimed at Ohio citizens."  (Third Am. Compl. ¶ 1, ECF No. 114.)  Ms. Hopper avers that "Credit Associates seeks pre-screened lists by identifying potential Ohioans based on certain factors bearing on creditworthiness, including (a) debt balances, (b) information about creditors

---

[1] Defendant Credit Associates filed two motions, one with a memorandum in support attached.

and debt (also known as "credit tradeline"), (c) high interest rate debt, and/or (d) unsecured debt, among other factors." *Id.* ¶ 24.

Plaintiff alleges that Credit Associates requests the lists of Ohioans who fit the designated factors, and thereafter Trans Union supplies such pre-screened lists. Plaintiff further alleges that Credit Associates then uses these lists to direct-mail markets its debt relief services to Ohioans, which is not permitted under the FCRA. Plaintiff avers that while the FCRA does permit a firm offer of credit, these solicitations did not comply with the requirements of committing to the credit before extending the offer.

Ms. Hopper was on one of these pre-screened lists. In late January of 2019, she received a letter from Defendant Credit Associates indicating that she was "PRE-APPROVED" and that:

> Records indicate you may have excessive credit card debt. Due to an important ruling to protect consumers in credit card debt, you are pre-approved for a debt relief program that can save you thousands of dollars with no upfront cost to you.

*Id.* ¶ 30.

The letter listed the dollar amount of Ms. Hopper's estimated credit card debt, a projected settlement amount, and the estimated program payment. Plaintiff was required to respond by February 25, 2019, to take advantage of her pre-approved status. The letter informed Ms. Hopper: "Your pre-approval provides a no-risk guarantee." *Id.* It elaborated, "pre-approval guarantees the extra deferral of fees that would have otherwise been due after each account is successfully resolved." *Id.* The letter also included a notice that informed Hopper that "[t]his 'pre-screened' offer of credit" was based on information in her credit report. *Id.*

The letter included a reference number, as well as a toll-free number that Ms. Hopper could call to speak with a Certified Debt Consultant. Around January 23, 2019, Plaintiff called the number and spoke to a Credit Associates representative.

A second letter came shortly after the first, dated January 25, 2019. The letter informed Ms. Hopper that it was her "FINAL NOTICE." *Id.* Ex. C. "Due to ongoing balance changes," it explained, "we may never contact you again so to ensure inclusion in our program, contact us immediately as your activation terms are eligible until March 11, 2019." The deadline had apparently been extended, and though this letter was similar to the first letter in most other respects, it included that the estimated program payment for Ms. Hopper was $140 per month.

Ms. Hopper avers that she did not authorize Trans Union or Credit Associates to request, provide and/or use her private financial data to send her solicitations. She further claims that numerous other Ohioans received those solicitations without applying for any services and without giving Credit Associates and Trans Union authority to access and use their private information for any purpose. Finally, Plaintiff concludes that both Defendants knew a resulting breach of privacy and other related injuries would occur to her and all other similarly situated Ohio consumers due to Defendants' unlawful conduct.

Defendant Trans Union previously moved to dismiss two of the counts filed against it for failure to state a claim upon which relief could be granted. Plaintiff alleged, *inter alia*, that Trans Union negligently and willfully violating the FCRA by providing Credit Associates with consumer reports without a proper purpose. This Court denied that motion. (ECF No. 67.)

Defendant Credit Associates moves to dismiss the claims against it for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Specifically, Credit Associates contend that Ms. Hopper lacks constitutional standing to bring this case.

## II.

"For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501 (1975).

Having invoked the jurisdiction of the federal courts, however, it is the plaintiff's burden to demonstrate that jurisdiction is proper. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561.

To establish standing under Article III of the United States Constitution, a plaintiff must show that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

### III.

Defendant Credit Associates challenges only whether Ms. Hopper suffered an injury in fact sufficient to meet the first element of the standing assessment. Plaintiff Ms. Hopper contends that Defendant violated the FCRA and that the statutory violations constituted a breach of privacy sufficient to constitute an injury in fact. This Court agrees.

**A.    The FCRA**

Plaintiff contends that the information Defendants accessed qualifies as a consumer report under the FCRA. To qualify as a consumer report, the information must bear on at least one of the following factors: a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics or mode of living. 15 U.S.C. §§ 1681a(d). In the present action, Plaintiff alleges that the information and filters utilized to acquire the information bear on all seven of the factors, including the total unsecured debt balance.

Credit Associates admits that it obtained pre-screened lists of individuals that contained names, addresses and estimated total unsecured debt balance as of the date of the list. Defendant contends that "plaintiff attempts to create the illusion Credit Associates obtained her full 'consumer report' in the sense of a credit report, including information [such as] a social security number, a list of creditors, credit standing, and a total amount and breakdown of all types of

debt." (Def's Mot. to Dismiss at 6, ECF No. 80-1.) Defendant also argues that there is a difference between "credit report" and "consumer report," which it contends are legally distinguishable and yet interchangeably used by Plaintiff.

The Court finds that it is unnecessary to determine whether Plaintiff inaptly uses the phrase consumer report or credit report. This is because Credit Associates agrees with Plaintiff that the information obtained "about plaintiff [and] conveyed to Credit Associates on a pre-screened list technically qualifies as a 'consumer report' under [FCRA] 15 U.S.C. § 1681(a)(d)." (Def's Mot. to Dismiss at 6, ECF No. 80-1.) Thus, the parties are in agreement that Plaintiff has sufficiently alleged that Defendants' actions technically violated the FCRA.

Defendant maintains, however, that the information it obtained "is not an invasion of privacy constituting an injury-in-fact for purposes of Article III. . . .[which] is a separate inquiry from whether the FCRA was violated." (Def's Reply at 3, ECF No. 85.)

**B.     Injury**

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), *as revised* (May 24, 2016) (quoting *Lujan,* 504 U.S., at 560) (internal quotation marks omitted). Defendant argues that Plaintiff has failed to show her injury is concrete or actual. A "concrete" injury must be "*de facto* "; that is, it must actually exist. *Id*. The *Spokeo* Court explained:

> "Concrete" is not, however, necessarily synonymous with "tangible." Although tangible injuries are perhaps easier to recognize, we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete.

*Id.* at 340 (citations omitted).

5

"In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Id*.

1. **History**

The Supreme Court explains that, "[b]ecause the doctrine of standing derives from the case-or-controversy requirement, and because that requirement in turn is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 578 U.S. at 340–41(citations omitted).

Defendant posits that ""Ohio recognizes four torts related to privacy: (1) appropriation or exploitation of the plaintiff's personality; (2) publication of the plaintiff's private activities; (3) wrongful intrusion into the plaintiff's private activities; and (4) portraying the plaintiff in a false light." Credit Associates argues that Plaintiff has failed to allege any harm that suffices to constitute any of these claims for relief recognized by Ohio.

Plaintiff responds that *Spokeo* does not demand a perfect fit with historical common law, but rather "a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts. *Spokeo*, 578 U.S. at 341. Ms. Hopper asserts that she has alleged such a harm. That is, "[o]ne who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other." Restatement (Second) of Torts § 652A; Cmt. A (1977). Ms. Hopper pled that Credit Associates unlawfully obtained and used her consumer reports in a manner prohibited by the FCRA, thereby violating her privacy interests. Plaintiff's arguments are well taken.

As this Court previously indicated in denying Trans Union's request for dismissal for failure to state a claim upon which relief can be granted: "Here the alleged injury is the invasion

6

of privacy that occurred when Trans Union furnished Credit Associates with Hopper's credit report without her consent and without a proper purpose." (Opinion and Order, at p. 10, ECF No. 67). The Court held that, when analyzing Ms. Hopper's allegations in the light most favorable to her, she sufficiently pleaded that Defendants caused tortious injury to her. Similarly, in the instant analysis, Plaintiff has sufficiently alleged the intangible harm of invasion of privacy of the type that has a close relationship to a harm that has traditionally been regarded as providing a basis for a for a lawsuit in English or American courts.

Misuse of credit reporting data is the harm the FCRA was designed to prevent by restricting access to consumer reports to permissible purposes, as explained in detail *infra*. This is the harm that Plaintiff has alleged here. Courts have traditionally provided an avenue of relief for alleged violations of privacy. Thus, Ms. Hopper has alleged harm having a close relationship causes of action recognized as a traditional basis for a lawsuit.

## 2. Judgment of Congress

Next, the Supreme Court directs this Court to consider Congress's judgment about "whether an intangible harm constitutes injury in fact." *Spokeo,* 136 S. Ct. at 1549. "Congress may 'elevat[e]' to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law.'" *Id.* (quoting *Lujan*, 504 U.S. at 578). Justice Kennedy's concurrence in *Lujan* explained that "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Id.,* at 580 (opinion concurring in part and concurring in judgment).

Congress enacted the FCRA in 1970 to protect the "consumer's right to privacy" by ensuring "the confidentiality, accuracy, relevancy, and proper utilization" of consumer credit information. 15 U.S.C. § 1681(b). The FCRA promotes these purposes through a set of

7

interlocking requirements, including the requirement that consumer reports may only be accessed and used for an FCRA-defined permissible purpose. 15. U.S.C. §§ 1681b(a) and (f).

"In passing the FCRA, Congress specifically recognized the 'elaborate mechanism' developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers' and the 'need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.'" *Nayab v. Capital One Bank USA,* 942 F.3d 480, 492 (9th Cir. 2019) (quoting 15 U.S.C. § 1681) (emphasis added). By enacting § 1681b, Congress purposefully limited the circumstances under which corporations can buy and sell reports containing private information about individuals. In doing so, Congress recognized that the selling of consumer reports without a permissible purpose harmed individuals' privacy interests.

Credit Associates correctly identifies that Congress, "balance[d] any privacy concerns created by pre-screening with the benefit of a firm offer of credit or insurance for all consumers identified through the screening process." (Def Credit Associates' Mem. in Supp., at 11, ECF No. 80-1 (quoting *Cole v. U.S. Capital,* 389 F.3d 719, 725 (7th Cir. 2004) and S. Rep. No. 103-209, 13 (1993)). Credit Associates does not dispute that Plaintiff has alleged that it did not make a firm offer in accordance with the requirements under the FCRA. ("A direct-mail solicitation only qualifies as a firm offer of credit by committing to the credit *before* extending the offer, and the consumer continues to meet the specific criteria used to select the consumer for the offer.") Defendant contends, however, that its "alleged violation was, at most, procedural in nature, *i.e.* a technical flaw in how the credit offer was structured, as opposed to a substantive intrusion into plaintiff's privacy" that violates the FCRA. (Def's Mot. to Dismiss at 11, ECF No. 80-1.)

8

Defendant is correct in its contention that some technical flaws do not constitute an intrusion into an individual's privacy. As the Supreme Court explained, a consumer agency using an incorrect zip code, for example, is a technical violation of the FCRA, but does not rise to a concrete injury sufficient to confer Article III standing:

> A violation of one of the FCRA's procedural requirements may result in no harm. For example, even if a consumer reporting agency fails to provide the required notice to a user of the agency's consumer information, that information regardless may be entirely accurate. In addition, not all inaccuracies cause harm or present any material risk of harm. An example that comes readily to mind is an incorrect zip code. It is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm.

*Spokeo*, 136 S. Ct. at 1550.

The Sixth Circuit puts it this way:

> So when a reporting agency issues a credit report that misstates the consumer's zip code, the plaintiff may have a statutory ticket to federal court because, in a hyper-literal sense, the agency failed to provide accurate information. But because the plaintiff has not sustained an injury in fact, Article III keeps the court's doors closed.

*Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 862 (6th Cir. 2020).

In the case *sub judice*, Ms. Hopper alleges that Credit Associates sought pre-screened lists by identifying Ohioans based on certain factors bearing on creditworthiness, including debt balances, information about creditors and debt, high interest rate debt, unsecured debt, credit scores and credit utilization rate among other factors. These allegations are simply not procedural in nature such that they would violate the FCRA only a hyper-literal sense.

In passing the FCRA, Congress identified and elevated certain intangible harms that meet the concreteness requirement, such as an invasion of privacy and the misuse of consumer reporting data. Here, Ms. Hopper sufficiently alleged both. Therefore, Plaintiff has shown that the meets the requirements necessary for constitutional standing.

9

## IV.

Based on the foregoing, the Court **DENIES** Defendant Credit Associates' Motion to Dismiss. (ECF Nos. 79, 80.)

**IT IS SO ORDERED.**

**3/29/2022**                                          **s/Edmund A. Sargus, Jr.**
**DATE**                                                  **EDMUND A. SARGUS, JR.**
                                                                 **UNITED STATES DISTRICT JUDGE**